UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | In Proceedings Under Chapter 11 |
| T&J RESTAURANTS, LLC, | ) | |
| | ) | Case No.    11-31622 |
| Debtor. | ) | |
| | ) | |

### AFFIDAVIT OF JOHN H. WHICKER
### IN SUPPORT OF CERTAIN FIRST DAY MOTIONS AND APPLICATIONS

John H. Whicker, being duly sworn on oath, deposes and says:

1.       I am the Member / Manager of T&J Restaurants, LLC ("**T&J Restaurants,**" or "**Debtor**"). As the Manager of Debtor, I am familiar with the day-to-day operations, business affairs, and books and records of Debtor.

2.       On July 21st, 2011 ("**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Illinois.  Debtor intends to continue in the possession of its properties and the management of its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has been established in this Chapter 11 case.  In order to enable Debtor to operate effectively and to avoid the adverse effects of the Chapter 11 filing, Debtor will request various types of relief in "first day" applications and motions filed with the Court.

3.    I submit this affidavit in support of the first day applications and motions in the above captioned Chapter 11 case.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application.  Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtor's operations and financial condition or information reported to me in the course of my duties by the Debtor's officers, agents, or employees.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this affidavit.

4.    Part I of this affidavit describes Debtor's business and the circumstances surrounding the filing of Debtor's Chapter 11 petition.  Part II sets forth the background of the prepetition secured debt, and Part III sets forth the relevant facts in support of Debtor's various first day applications and papers filed concurrently herewith.

## I.    BACKGROUND

1.    T&J Restaurants, LLC ("T&J") has been operating restaurants in Missouri and Southern Illinois since 1997.  In 1997 T&J Restaurants bought four existing restaurants from Chevys Inc. and became the first Franchise of Chevys Fresh Mex Restaurants with operating restaurants in the United States.  T&J has had as many as eleven restaurants at one time.  T&J sold its unit in Champaign Illinois to a manager who formed his own Franchise in 2001.  T&J Restaurants closed its Chevys Express Mex units in the food courts at West County Mall and South County Mall as well as the restaurant in Crestwood Mall.

2.    Below are the recitals from the T&J Restaurants, LLC Operating Agreement showing transfers of interests from 1997 to present:

**WHEREAS**, John H. Whicker ("Whicker") and Ted L. Geiger ("Geiger") formed the Company on or about May 27, 1997, and entered into that certain Operating Agreement of T & J Restaurants, L.L.C. effective as of May 19, 1997 (the "Original Operating Agreement");

**WHEREAS**, on June 19, 2001, Whicker purchased a 13% Interest in the Company from Geiger, and Whicker and Geiger amended and restated the Original Operating Agreement in its entirety pursuant to the terms of that certain Amended and Restated Operating Agreement of T & J Restaurants, L.L.C. (the "First Restated Operating Agreement");

**WHEREAS**, on January 1, 2002, certain key managers (i.e., the Class C Members and Kimberly Barnett ("Barnett") and Kevin Miller ("Miller")) purchased from Geiger portions of Geiger's Interest in the Company, Whicker and Geiger admitted such key managers as Members of the Company, and such Members amended and restated the First Restated Operating Agreement in its entirety pursuant to the terms of that certain Second Amended and Restated Operating Agreement of T & J Restaurants, L.L.C. (the "Second Restated Operating Agreement");

**WHEREAS**, as of March 29, 2002, the Company redeemed Barnett's Interest, and the remaining Members amended the Second Restated Operating Agreement pursuant to the terms of that First Amendment to Second Amended and Restated Operating Agreement dated as of March 29, 2002 (the "First Amendment");

**WHEREAS,** as of July 30, 2002, Whicker purchased all of Geiger's remaining Interest in the Company, and Whicker, the Class C Members, Miller and Geiger amended and restated the Second Restated Operating Agreement in its entirety pursuant to the terms of that certain Third Amended and Restated Operating Agreement of T & J Restaurants, L.L.C. (the "Third Restated Operating Agreement");

**WHEREAS**, as of November 19, 2002, Tim Glover ("Glover") purchased a 1.7058% Interest in the Company from Whicker, all of the Class C Members, Miller and Glover made a $10,000 Additional Capital Contribution to the Company, and Whicker, the Class C Members, Miller and Glover amended and restated the Third Restated Operating Agreement in its entirety pursuant to the terms of that certain Fourth Amended and Restated Operating Agreement of T & J Restaurants, L.L.C. (the "Fourth Restated Operating Agreement");

**WHEREAS**, on our about January 18, 2005, Whicker transferred his entire Member Interest in the Company to Whicker Trust, his revocable trust; and

**WHEREAS**, as of April 5, 2005, Whicker Trust, the Class C Members, Miller and Glover further amended and restated the Fourth Restated Operating Agreement (i) to reflect the transfer of Member Interest to Whicker Trust, (ii) to provide for the sale of Whicker Trust's Interest in the Company in the event of the death of Whicker, and (iii) to reflect certain other changes which had transpired since the execution of the Fourth Restated Operating Agreement, pursuant to the terms of that certain Fifth Amended and Restated Operating Agreement of T & J Restaurants, L.L.C. (the "Fifth Restated Operating Agreement"); and

**WHEREAS**, as of May 30, 2005, the Company redeemed Glover's Interest pursuant to the terms of that certain Membership Interest Redemption Agreement dated as of May 30, 2005 (the "Glover Redemption Agreement"), and Whicker Trust, the Class C Members and Miller amended the Fifth Restated Operating Agreement pursuant to the terms of that certain First Amendment to Fifth Amended and Restated Operating Agreement dated as of May 30, 2005 (the "First Amendment to 5th Restated Agreement"); and

**WHEREAS**, as of August 1, 2005, the Company redeemed Miller's Interest pursuant to the terms of that certain Membership Interest Redemption Agreement dated as of August 1, 2005

(the "Miller Redemption Agreement"), and Whicker Trust and the Class C Members further amended the Fifth Restated Operating Agreement pursuant to the terms of that certain Second Amendment to Fifth Amended and Restated Operating Agreement dated as of August 31st, 2005 (the "Second Amendment to 5th Restated Agreement"); and

**WHEREAS**, as of the date of this Amendment, Whicker Trust is selling 2.263% of its Membership Interest in the Company to El-Qunni, 1.000% of its Membership Interest in the Company to Boulch, 0.750% of its Membership Interest in the Company to Tinker, and 0.50% of its Membership Interest in the Company to Bemis pursuant to the terms of certain Membership Interest Purchase Agreements of even date herewith; and in connection therewith, the parties hereto desire to further amend the Fifth Restated Operating Agreement to reflect the foregoing transfers of Membership Interest from Whicker Trust to El-Qunni, Boulch and Tinker and

**WHEREAS**, as of August 31, 2009, the Company redeemed Bemis's Interest pursuant to the terms of that certain Membership Interest Redemption Agreement dated as of August 31st, 2009 (the "Bemis Redemption Agreement"), and Whicker Trust and the Class C Members further amended the Fifth Restated Operating Agreement pursuant to the terms of that certain Fourth Amendment to Fifth Amended and Restated Operating Agreement dated as of August 31st, 2009 (the "Fourth Amendment to 5th Restated Agreement").

3.      From 1999 until 2008 T&J had good performance that enabled it to grow from the original four restaurants to as many as eleven (11) restaurants. In 2008 T&J Restaurants began a cooperative effort with Homeland Security to verify that all of its employees were legal to work in the United States. From 2008 through June 2010 T&J, with the help of Homeland Security and the E-Verify program, terminated over 120 employees due to false identification. That effort was devastating to the operations of the company and was the major contributor to a negative

trend in Net Sales for T&J. The loss of so many highly trained employees caused food quality and service to suffer resulting in loss of customers and sales. The economic recession and macro-economic factors from 2008 to present coupled with the loss of these key employees was devastating to T&J revenues. In 2010 T&J Restaurants simplified the operation, re-trained, and since August 2010, the food quality, service and over all operations of the company has returned to the standards that T&J guests expect.

4.      With sales dropping from a high of nearly $24MM in 2007 to less than $20MM in 2009 GE Capital, our primary secured debtor, agreed to interest only payments for 12 months. That was in an effort to increase cash flow until the economy got stronger. The economy did not get stronger during that year, and our sales continued to decline. In October of 2010 GE Capital required T&J Restaurants to pay principle and interest payments again.

5.      In 2009 T&J did not have the cash flow to meet all its obligations, and did not pay Royalty and Marketing fees to Real Mex Restaurants, LLC its Franchisor, for most of 2009. By the end of 2009 those fees had mounted up to nearly $900K. In 2010 because of better operations, and loans from John Whicker, T&J was able to pay all of the 2009 delinquent Royalties and Marketing fees to Real Mex, and keep up with the 2010 and 2011 Royalty and Marketing Fees. Currently, approximately three (3) months of Royalty and Marketing fees for 2011 are due to Real Mex, Inc.

6.      In 2010 T&J was contemplating filing Chapter 11 Reorganization and did not pay the rent to several landlords for three locations they intended to reject leases. In late August 2010 T&J determined it had streamlined the company enough to survive without filing Chapter 11 Reorganization. At that point the landlords that had not been paid for several months filed lawsuits and obtained consent judgments. Consequently, T&J had to not only make regular rent

payments, but worked out re-payment plans with those three landlords. This caused rents to be much higher than normal. Through the sale of various real estate properties, John Whicker was able to loan T&J approximately $1.4MM to continue to make payroll and other obligations to keep operating.

7.      With the economy and unemployment continuing to struggle in the St. Louis Metro area where T&J Restaurants stores are located, and the increased rent burdens, T&J Restaurants can not meet the cash flow demands.   T&J Restaurants feels its operation is strong and sales will recover at the same pace as the local economy.   Without renegotiating or eliminating some of the above market rents, and restructuring the debt, T&J Restaurants will not be able to recover fast enough to meet the current obligations.   T&J Restaurants feels a CH 11 Reorganization is the best business decision for a long term future.

## II.      DEBTOR'S PRE-PETITION SECURED LENDERS

8.      T&J Restaurants primary secured lender is General Electric Capital Corporation (GE Capital).  As of July 1st 2011 the total due to GE Capital is show in the five loans below:

| Loan / Invoice Number | Amount |
|---|---|
| FF14751001C060111 | $2,815,767.13 |
| FF13205F22C070511 | $875,052.08 |
| FF13205FC2C070111 | $545,139.99 |
| FF14751F22C070111 | $535,153.97 |
| FF13205S49C070111 | $121,826.77 |
| **TOTAL** | **$4,892,939.74** |

9.      As of July 8th 2011 the following Royalty & Marketing Payments were due to Real Mex Restaurants, LLC.:

Period 4 ( 3/28 – 4/24/ 2011)          $49,618.

Period 5 (4/25 – 5/22/ 2011)          $59,541.

Period 6 (5/23 – 6/26/2011)          $62,220.

10.     Debtor is indebted to AG/CP Crestwood Mall for $64,275 (remaining) per the contract negotiated to terminate the lease at Crestwood Mall in September 2009.

11.     Debtor is indebted to CBL West County Mall for $55,000 (remaining) per the contract negotiated to terminate the lease at West County Mall in October 2009.

12.     Debtor is indebted to Marlin Business Bank for $62,908 per lease contract signed in April 2011.

13.     Debtor is indebted to Rewards Network for $145,147 as of July 3, 2011.

14.     Debtor is indebted to Esam El-Qunni, a Member of T&J Restaurants LLC for $18,942.

15.     Debtor is indebted to John Whicker the Managing Member of T&J Restaurants LLC for $1,315,674. in personal loans to the company.

### III.    MOTIONS AND APPLICATIONS

16.     An important element of Debtor's successful Chapter 11 case is approval of each of Debtor's motions and applications submitted concurrently herewith.  Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

### Retention of Lathrop & Gage LLP and Desai Eggmann Mason LLC

17.     Continued representation of Debtor by its counsel, Lathrop & Gage LLP ("Lathrop & Gage") and Desai Eggmann Mason LLC (DEM LLC), respectively, is critical to the success of Debtor's Chapter 11 proceeding because Lathrop & Gage and DEM LLC are uniquely

familiar with Debtor's business and legal affairs as more fully set forth in the Applications for the retention of Lathrop & Gage and Affidavit of Robert E. Eggmann and the Application for the retention of DEM LLC and Affidavit of Spencer Desai.

18.    Debtor selected the firm of Lathrop & Gage and DEM LLC as attorneys because of the firm's national experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

19.    Debtor desires to employ the firm of Lathrop & Gage and DEM LLC under a general retainer because of the extensive legal services that will be required in connection with the Chapter 11 case.

20.    The services of attorneys under a general retainer are necessary in order to enable Debtor to faithfully execute its duties as debtor in possession.  Subject to further order of this Court, Lathrop & Gage and DEM LLC will be required to render, among others, the following services to Debtor:

a.    Advising Debtor with respect to their rights, power and duties in this case;

b.    Assisting and advising Debtor in its consultations with any appointed committee relative to the administration of this case;

c.    Assisting Debtor in analyzing the claims of creditors and negotiating with such creditors;

d.    Assisting Debtor with investigation of the assets, liabilities and financial condition of Debtor and reorganizing Debtor's businesses in order to maximize the value of Debtor's assets for the benefit of all creditors;

e.    Advising Debtor in connection with the sale of assets or business;

f.    Assisting Debtor in its analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

g.    Assisting and advising Debtor with respect to any communications with the general creditor body regarding significant matters in this case;

h.      Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtor;

i.      Reviewing, analyzing or preparing, on behalf of Debtor, all necessary applications, motions, answers, orders, reports, schedules, pleadings and other documents;

j.      Representing Debtor at all hearings and other proceedings;

k.      Conferring with other professional advisors retained by Debtor in providing advice to Debtor; and

l.      Performing all other necessary legal services in this case as may be requested by Debtor in these Chapter 11 proceedings; and

m.      Assisting and advising Debtor regarding pending arbitration and litigation matters in which Debtor may be involved, including continued prosecution or defense of actions and/or negotiations on Debtor's behalf.

21.      The firms of Lathrop & Gage and DEM LLC have indicated a willingness to act on behalf of Debtor.

22.      To the best of Debtor's knowledge, Robert E. Eggmann, Spencer Desai and the other members, counsel, and associates of the firms of Lathrop & Gage, LLP and Desai Eggmann Mason LLC (i) do not have any connection with Debtor, its affiliates, creditors, or any other parties in interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the affidavit and statement of Robert E. Eggmann, a partner of Lathrop & Gage, filed concurrently herewith.

## CASH COLLATERAL

23.     The Debtor requires the use of Cash Collateral and Postpetiton Financing to continue its business operations and to pay its regular daily expenses, including employees' wages, utilities, and its other costs of doing business.

24.     The Debtor requires cash collateral to meet post-petition payroll, to pay necessary business expenses, and to continue its operations.  A Monthly Budget, showing the amount of funds needed to maintain Debtor's operations until the entry of a final order permitting use of cash collateral, is included as Exhibit A to the Stipulation attached to the Motion to Approve Stipulation Authorizing Use of Cash Collateral.

25.     The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without use of the Cash Collateral.  The Debtor's ability to preserve their relationship with vendors and suppliers, to pay its employees, and to otherwise finance its operations, is essential to the Debtor's continued viability.

26.     The terms of the Stipulation are set for the in the Cash Collateral Motion and Stipulation.  The terms and conditions of the Stipulation, including the terms under which the Bank will receive certain security interests, are fair and reasonable under the circumstances. Obtaining credit and incurring debt pursuant to the proposed Stipulation are actions reasonable and necessary to continue the Debtor's business operations and to preserve its bankruptcy estate. Thus, the Debtor believes that the entry of an order granting the interim and final relief requested in this Motion is in the best interests of its estate and creditors.

### Maintenance of Cash Management System

27.     Debtor has requested authority to continue using its existing bank accounts, cash management system, and business forms in its *Emergency Motion for Order Authorizing*

*Maintenance of Cash Management System, Continued Use of Certain Existing Bank Accounts, Deposit Practices, and Continued Use of Certain Business Forms* (the "**Bank Account Motion**").

28.     Debtor maintains a multipart banking system (the "**Cash Management System**") to process its revenues and expenses.

29.     Two of the Debtor's accounts are maintained at Enterprise Bank.  On or about the Petition Date, Account no. ****20650 with Enterprise Bank contained a balance of $76,480.00. Account no. ****20650 serves as the main operating account for Debtor; and Account no. ****66843 with Enterprise Bank contained a balance of $8,290.00.  Account no. ****66843 serves as the payroll account for Debtor.

30.     One of the Debtor's accounts is maintained at Regions Bank.  On or about the Petition Date, Account no. ****8830 with Regions Bank contained a balance of $855.00. Account no. ****8830 serves as a checking account for deposits from Debtor's Ellisville location.

31.     One of the Debtor's accounts is maintained at Bank of America.  On or about the Petition Date, Account no. ****8430 with Bank of America contained a balance of $647.00. Account no. ****8430 serves as a checking account for deposits from Debtor's O'Fallon location.

32.     One of the Debtor's accounts is maintained at US Bank.  On or about the Petition Date, Account no. ****8368 with US Bank contained a balance of $1,030.  Account no. ****8368 serves as a checking account for deposits from Debtor's Columbia location.

33.     For its main operating account at Enterprise Bank, Debtor's Cash Management System operates as follows:

a.    Debtor administers its own payroll every two weeks. Debtor disperses the withholding taxes automatically out of the main operating account. All transactions are approved and initiated by authorized personnel. We have given some vendors (like Rewards Network and US Foods) authority to auto debit our account for payments, but not for payroll.

34.    The Cash Management System is governed by various documents, agreements, internal procedures and understandings between Debtor and its lenders.

35.    Because of the nature of Debtor's Cash Management System, it would be difficult, disruptive and expensive for Debtor to close its existing accounts and open new accounts. Additionally, any disruption of the existing system would not only impair current operations, it would interrupt and delay financial reporting by Debtor to the Court because the existing internal accounting system is based on the availability of the data generated as a byproduct of the existing Cash Management System.

36.    Maintaining Debtor's existing accounts will enhance reorganization efforts and lessen the confusion among employees, vendors, and potential customers that often follows a Chapter 11 filing. Opening new bank accounts would be unduly burdensome, be disruptive to Debtor during this critical initial stage of the Chapter 11 process and may take several weeks to complete. Furthermore, Debtor has preprinted check stock that would require unnecessary time and expense to replace.

37.    Approximately $150,000.00 in accounts payable checks had not cleared Debtor's bank account as of the Petition Date. The checks are primarily related to inventory and operating expenses, including utilities. Debtor requests that Bank be authorized to honor all checks presented.

38.     Unless Debtor is allowed to maintain its existing accounts, it will be unable to effect a smooth transition into its Chapter 11 proceeding.  Maintenance of the existing accounts will not prejudice any party in interest.  However, the inability to maintain existing accounts will prejudice Debtor, as well as its employees, vendors, and providers, as it may take approximately two weeks to receive new checks or may require time and expense in reprogramming certain printers and software.  Accordingly, the entry of an order granting the relief requested is in the best interest of Debtor's estate, employees, and creditors.

### Business Necessity to Pay Pre-Petition Employee Claims

39.     Debtor has requested authority to pay outstanding pre-petition Employee wages and benefits under the *Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits* ("**Wage Motion**").

40.     Debtor currently employs 450 salaried and hourly employees, which include management, office staff, and other necessary staff.  Some of the employees are full-time and some are part-time.  All of these employees are on the payroll of, and paid by, Debtor.  The majority of employees are paid on an hourly basis.  A smaller percentage of employees are paid on a salaried basis.   All employees will suffer great hardship if they were to lose or suffer any delay in receiving their pay and/or benefits.

41.     Failure to pay the pre-petition employee claims (the "**Pre-Petition Employee Claims**") as described and identified in the Wage Motion would cause Debtor's employees to suffer undue hardships and, in many instances, financial difficulties because such amounts are necessary to enable employees to meet their respective personal, household and family obligations.  Such a result would obviously destroy employee morale and result in unmanageable

employee turnover. The Debtor submits that any significant deterioration in morale at this time will substantially and adversely impact the Debtor and its ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

42.     In addition, the Debtor believes that most, if not all, of the Pre-Petition Employee Claims will be entitled to priority status. Upon my information and belief, no single employee is owed more than $11,725 in total Pre-Petition Employee Claims. Thus, these employees will most likely be entitled to seek priority status for their claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

43.     To the extent that payment of the amounts described in the Wage Motion may subsequently be determined to be greater than a recipient thereof would otherwise have received if these cases were commenced or proceeded under Chapter 7 of the Bankruptcy Code, Debtor (or any subsequently appointed Trustee) expressly reserves the right to seek recovery of such payments.

44.     Debtor submits that the amounts to be paid to employees pursuant to the Wage Motion are reasonable compared with the importance and necessity of the services of the employees and the losses Debtor will likely suffer if those amounts are not paid.

45.     The requested relief also will reduce significantly the administrative burden which otherwise might be imposed in the Chapter 11 case. For Debtor to identify whether and to what extent individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expense which seem unwarranted under the circumstances of these cases.

## Utilities

46.     In connection with the operation of its business, Debtor obtains electricity, water, telephone and other similar services from several utility companies or utility divisions.  Any interruption in these services would seriously disrupt Debtor's normal day-to-day operations, thereby causing potentially irreparable harm to the reorganization of Debtor.  **Exhibit A** to the Debtor's *Emergency Motion for Order Approving Debtor's Method of Furnishing Adequate Assurance of Payment of Post-Petition Utility Services* (the "**Utilities Motion**") is a list of all the utility companies that currently provide services to Debtor.  The utility companies identified in Exhibit A with respect to their function as providers of utility services shall be referred to as the "**Utilities**."

47.     The Utilities service Debtor's facilities.  Without utilities, Debtor would be inoperable.  Utility services are essential to Debtor's ability to reorganize.

48.     No Utility currently holds a deposit from Debtor.

49.     The Debtor believes that the following offer to provide adequate assurance of payment to the Utilities is sufficient to preclude unilateral termination by a utility under 11 U.S.C. § 366(b):

n.      As Debtor has never missed a utility payment, Debtor does not believe a deposit is necessary for adequate assurance of payment;

o.      Debtor shall timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements generated by the utility companies in the ordinary course of business;

p.      In the event that Debtor fails to timely pay for post-petition utility service per an invoice, Debtor shall have a ten (10)-day period to cure such nonpayment, which ten (10)-day period shall begin to run automatically from the date of the non-payment notice from the utility company;

q.      Should Debtor fail to pay the invoice within the ten (10)-day time period after receipt of notice of default, the utility company shall be entitled to alter, refuse or discontinue service, without further Court order;

r.    If a utility company maintains more than one account for Debtor, the failure to pay for post-petition utility services with respect to one account shall not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, and the ability to alter, refuse or discontinue service shall arise on a per account basis; and

s.    To the extent that a utility company provides post-petition services that are unpaid, such utility company shall be entitled to an administrative claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable upon confirmation of a plan of reorganization or such earlier date as determined by the Court. Further, existing deposits held by Debtor's utility providers may be offset against any past-due pre-petition or post petition invoice without necessity of court order or prior notice to creditors.

50.    Debtor believes that these provisions provide utility companies with "adequate assurance" of payment.

51.    Debtor will pay all post-petition utility bills when due. If any delay occurs, Debtor believes that the proposed assurances will more than provide sufficient protection to the utility companies providing post-petition services.

### Taxes

52.    In the ordinary course of business, Debtor pays taxes to a number of different taxing authorities at the federal, state and local levels (the "**Taxes**").

53.    Taxes accrue as wages are earned and are calculated based upon a statutorily mandated percentage of gross wages employees earn.

54.    Using the funds from Debtor's main operating account at Enterprise Bank, Debtor will administer Debtor's payroll and disburses the withholding tax obligations to the taxing authorities.

55.    Debtor also pays Taxes involving sales and use taxes to the States of Missouri and Illinois. Debtor routinely generates sales reports and then calculates the sales and use taxes and pays such taxes. On June 20, 2011, Debtor paid May 2011 sales tax in the amount of

$98,148.63, and on August 1, 2011, Debtor will be required to pay June 2011 sales taxes in the approximate amount of $84,475.00.

56.     Debtor is also responsible for various miscellaneous taxes and fees incurred in the ordinary course of business, such as annual report fees, state registration fee, and franchise tax, as well as other taxes and fees levied under federal, States of Missouri and Illinois, and local authorities.

57.     Debtor seeks authority from this Court to continue making such payments in the ordinary course of business for all pre-petition and post-petition withholding, sales and use taxes that are for the benefit of the taxing authorities.

58.     Debtor believes that most, if not all, of the Taxes likely constitute so called "trust fund" taxes which are required to be collected from third parties and held in trust for payment to taxing authorities.  Debtor seeks authority to pay the Taxes in the ordinary course of its business.

### Critical Vendors

59.     Debtor seeks an order authorizing, but not directing it, to honor and pay certain prepetition claims (the "Critical Vendor Claims") of critical vendors (the "Critical Vendors") in the ordinary course of business, and directing Debtor's banks to continue to honor and pay checks issued prepetition on account of Critical Vendor Claims that have yet to be cashed to ensure that these essential goods and services will continue to be available to Debtor without interruption. By this Motion, Debtor seeks authority to pay Critical Vendor Claims in an aggregate amount not to exceed $150,000.00 (the "Critical Vendor Cap") if Debtor determines in its sole discretion that such immediate payment is necessary to prevent irreparable harm and significant disruption to Debtor's business operations. The Critical Vendor Claims that Debtor seeks authority to pay on the first day all fall within that stringent criteria.

60.     The Debtor seeks to pay the Priority Vendor Claims as they come due in the ordinary course instead of satisfying these claims upon confirmation of a chapter 11 plan. The Debtor believes that by merely altering the timing of such payments, Priority Vendors may be more likely to adhere to favorable trade terms and do business with the Debtor on a going-forward basis. The Debtor believes that this relief is in the best interests of the Debtor's estates because: (a) favorable trade terms will prevent the contraction of the Debtor's liquidity; (b) this Court's time and resources will not be burdened with motions from individual Priority Vendors requesting immediate payment on account of their Priority Vendor Claims; and (c) because a plan of reorganization will be filed shortly, the Debtor anticipates the duration of this case to be short and payment of such claims in the ordinary course will not prejudice the rights of other administrative expense claimants.

FURTHER AFFIANT SAYETH NOT.

_John H. Whicker_

John H. Whicker

16614500v1                                      19

STATE OF MISSOURI            )
                             ) SS.
COUNTY OF ST. CHARLES        )

On this 21 day of July, 2011, before me, the undersigned, a Notary Public, in and for the County and State aforesaid, personally appeared **JOHN H. WHICKER**, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in St. Charles County, Missouri, the day and year last above written.

_Nancy J. Neske_
Notary Public in and for said County and State

My Commission Expires:

NANCY J. NESKE
Commission #09475320
Notary Public - Notary Seal
STATE OF MISSOURI
St. Charles County
My Commission Expires: Oct. 19, 2013